Thompson *et al. v.* The Connecticut Mutual Life Insurance Co. *et al.*

---

No. 16,900.

THOMPSON ET AL. *v.* THE CONNECTICUT MUTUAL LIFE INSURANCE COMPANY ET AL.

APPEAL.—*Notice to Coparties.—Fixing Penalty of Bond and Naming Sureties in Term, but Filing in Vacation.*—Where at the time a judgment is rendered an appeal is prayed and granted upon the filing of a bond in a fixed sum, with named persons as sureties, within thirty days, and within that time, although the court is then in vacation, a bond is filed with the sureties and penalty as fixed by the court, the appeal so taken is a term time appeal, and no notice to the coparties not joining is necessary.

MORTGAGE.—*Subrogation.—Foreclosure.—Payment.—Extinguishment.*—Where the holder of a prior mortgage brings suit to foreclose it, making a junior mortgagee a party, and a decree of foreclosure is

given, upon which there is a sale of the mortgaged land to the plaintiff, who takes a certificate of sale, and who, later, believing the junior mortgage cut out by the decree, accepts partial payment of his judgment and takes a new mortgage upon the land for the balance from an intervening purchaser, to whom he assigns the certificate of sale without any knowledge that such purchaser had agreed to pay off the incumbrances, the lien of the first mortgage is not extinguished by the execution of the second one for the same debt, but the former will be kept alive to protect its holder from the intervening lien. And, also, where a still later purchaser of the land, without knowledge of the intervening mortgage, applies for and secures a loan thereon from a third person, who likewise is ignorant of such mortgage and who believes that the second mortgage executed to the senior incumbrancer is the only lien upon the land, and a part of the loan so secured is used in paying off such lien, such last mortgagee is entitled to be subrogated to the rights of the holder of such lien to the extent of the money paid thereon out of the loan made by him, as against the intervening mortgagee and the persons succeeding to his rights with knowledge, and as to so much he is entitled to a first lien.

SPECIAL FINDINGS—*Power of Court to Amend.—Cases Modified.*—A trial judge may, in all cases, amend his special findings of facts and conclusions of law at any time before final judgment and during the period within which a bill of exceptions containing the evidence may be filed. *Wray* v. *Hill,* 85 Ind. 546, and decisions following that case, modified.

From the Lake Circuit Court.

*B. Borders* and *F. L. Dukes,* for appellants.
*C. L. Holstein* and *C. E. Barrett,* for appellee.

HOWARD, J.—This action was begun in the Pulaski Circuit Court, and was taken, on change of venue, to the court below. It was brought by the appellee, the Connecticut Mutual Life Insurance Company, against the appellees Gellinger and wife and Sourbeer and wife, to foreclose two mortgages, one against the Gellingers and one against the Sourbeers.

The appellants were also made defendants to assert any right which they might have. They filed their answer, and also a cross-complaint, to foreclose a mortgage

set up by them against the insurance company, the Gellingers and the Sourbeers, all of whom answered the cross-complaint. Other pleadings were also filed.

The actions were consolidated. The court found that the insurance company had a first lien on the land in controversy, that the appellants had a second lien, and the company a third lien. A decree was entered accordingly, and the appellants then appealed to this court.

The insurance company, claiming that the appeal was not well brought, has filed a motion that it be dismissed, for the reason that the appeal bond was not approved by the court as required by law, and because notice to co-parties not appearing was not given.

The judgment appealed from was rendered in the Lake Circuit Court, December 22, 1892. On the same day the appeal was prayed, and was granted by the court upon the filing of an appeal bond in the sum of $1,600, with John F. Borders and George W. Thompson as sureties. The time within which the bond should be filed was fixed at thirty days, which would extend until after the adjournment of the term of court. On January 18, 1893, in vacation of court, but within the thirty days allowed, the bond was filed, with the sureties and penalty as fixed by the court.

The questions, as raised by counsel on this motion, have not, as we believe, been expressly decided. We think, however, that the appeal so made was a term-time appeal, and was well taken, as provided by section 650, R. S. 1894 (section 638, R. S. 1881).

Judge Buskirk (Prac. 61), in stating what must be done to effect an appeal in term, under the statute, says:

"1. An appeal must be prayed for and granted by the court during the term of the court at which the judgment was rendered.

"2. The appeal bond must then be filed and approved

by the court, or it must be filed within such time as the court may direct of record; but in either event the penalty of the bond must be fixed and the surety approved by the court.

"3. If the bond is not filed in term, the court must fix the penalty, * and direct in what time the bond must be filed.

"4. The bond must be filed within the time directed.

"5. The transcript must be filed in the office of the clerk of the Supreme Court within sixty days from the time the bond is filed."

This statement is approved as correct in Works' Prac., section 1088, and in Elliott's App. Proced., sections 247, 248, 249, 525 and notes. All these authorities hold, likewise, that where the appeal is taken during the term no notice is necessary.

In *Ex parte Sweeney*, 131 Ind. 81, it was adjudged: "That the filing of a bond is an essential step in perfecting a term appeal, and that where a bond is not filed within the time limited by the order granting the appeal, the appeal must be upon notice."

In *Holloran* v. *Midland R. W. Co.*, 129 Ind. 274, which, like this, was a case where a part of the coparties had appealed, and had failed to notify a coparty who had not joined in the appeal, it was said by the court that when the provisions of section 650, R. S. 1894 (section 638, R. S. 1881), providing for appeals in term time, are complied with, no notice is required; that "this section requires the fixing of the penalty of the bond and the surety to be given, and that the same be approved by the court"; and that "when the bond is given and other steps taken, as required by this section, within the time fixed by the court, no notice of appeal is necessary."

In that case, the court found that the appeal was not

taken in term, in accordance with the provisions of section 650, *supra;* and also that notice was not given, in accordance with section 647, R. S. 1894 (section 635, R. S. 1881), and the appeal perfected within one year from the date of the final judgment. It was, therefore, held that the appeal must be dismissed.

It has long been held, that, in·a term time appeal, no notice is required to be given to adversary parties. From the foregoing authorities, it is equally clear, that, in a term time appeal, no notice need be given to coparties not appealing.

All the parties, coparties no less than adverse parties, are before the court, either in person or by counsel or both, when judgment is rendered, and the appeal in term taken; and all are there equally bound to be informed of what occurs in due course in the proceedings. Elliott's App. Proced., section 173.

When service is made on coparties, or notice given them, the service is had, or the notice given, as in case of adverse parties. Elliott's App. Proced., section 181. No good reason can therefore be advanced why coparties should receive notice of an appeal taken in term any more than adverse parties. All being present in court must be held to take notice of what is there done in due course of business.

If the appeal in this case, then, was an appeal in term we conclude that no notice to the coparties not appealing was necessary. It is enough to name them in the record and in the assignment of errors as parties to the appeal.

But counsel say that the appeal was not taken in term, for the reason that the appeal bond, as it appears in the record, was not approved by the court.

The penalty of the bond was fixed, and the sureties were named by the court. The court also fixed the time

within which the bond should be filed, and it was filed within that time, in the sum fixed by the court, and with the sureties named in the order of the court.

Under the authorities which we have cited, we think this was sufficient. By the fact of naming the sureties, the court did, in effect, approve of them as such sureties for the sum fixed in the bond. The appeal was, therefore a term time appeal, which was fully perfected as required by the statute. We must, consequently, notwithstanding the earnest and learned argument of counsel, still adhere to the former ruling of this court, in the cases of *Conaway* v. *Ascherman,* 94 Ind. 187, and *Wilson* v. *Bennett,* 132 Ind. 210, and hold that no notice was necessary to the coparties not joining in the appeal. The motion to dismiss the appeal is overruled.

While, under the various assignments of error, numerous questions in relation to the pleadings, and the rulings of court are discussed in the briefs of counsel, we are yet satisfied that the merits of this case may best be considered in an examination of the special findings of the court, and the conclusions of law made at the request of the defendants, which are as follows:

"1. The court finds from the evidence that on the 20th day of December, 1870, Christian Blockberger became the owner of the southwest quarter of section two, township thirty-one north of range two west, in Pulaski county, Indiana, containing one hundred and sixty acres; that on the 2d day of November, 1874, while owning said land he, by proper deed, in which his wife joined, conveyed said land to John Cupfer and Fritz Kupfer, who then became the owners in fee simple.

"2. The court finds that on the 14th day of August, 1877, John Kupfer, Maria E. Kupfer, his wife, and Fritz Kupfer, executed to the Ætna Life Insurance Company a mortgage on said land to secure a loan of $800,

and that said mortgage was duly recorded in the recorder's office of Pulaski county, Indiana, in Mortgage Record H, page 314, and was so recorded September 1, 1877.

"3. And the court further finds that on the 4th day of September, 1877, John Kupfer, Maria E. Kupfer, his wife, and Fritz Kupfer, executed to Christian Blockberger a mortgage on the southwest quarter of section two, township thirty-one north, of range two west, Pulaski county, Indiana, and also upon the north half of the northwest quarter of section eleven, in the same town and range, county, and State, to secure the payment of a note of the same date, made by said John and Fritz Kupfer to Christian Blockberger, calling for two hundred and seventy-three dollars and seventy-two cents, and six per cent. interest from date, due in three years; that said mortgage contained covenants of warranty, and also contained an express promise to pay the debt thereby secured without any relief from valuation or appraisement laws, and said mortgage was properly recorded in the mortgage records of Pulaski county, Indiana, on the 4th day of September, 1877, in the recorder's office of Pulaski ·county, Indiana, in Mortgage Record H, page 322.

"4. And the court finds that out of said sum of eight hundred dollars so loaned said Kupfer by said Ætna Life Insurance Company, and secured by the mortgage referred to in finding two herein, the said Kupfer paid to Christian Blockberger all of the purchase-money yet due him for said southwest quarter of section two, except the sum of two hundred and seventy-three dollars and seventy-two cents, and the mortgage referred to in finding number three was given for the said balance due said Blockberger, and it was expressly agreed in said mortgage to Blockberger that the same was subject to the

eight hundred dollar mortgage to the Ætna Life Insurance Company.

"5. And the court finds that after John Kupfer became the owner of all the land described in the aforesaid Blockberger mortgage, and after the Ætna Life Insurance Company had foreclosed its mortgage as hereinafter set out, William H. Thompson made an agreement with said John Kupfer, that he, Thompson, would convey to said Kupfer a certain forty-seven acre tract in Pulaski county, Indiana, and said John Kupfer agreed that he would execute to said Thompson a mortgage upon said land for three hundred dollars, and would convey his equity of redemption in the said southwest quarter of section two and the north half of the northwest quarter of section eleven, township thirty-one north, range two west, in Pulaski county, Indiana, to whomsoever the said Thompson should direct, and the said Thompson agreed to have the incumbrances thereon paid when he should sell said lands, which incumbrances consisted of the aforesaid Blockberger mortgage and a judgment in favor of the Ætna Life Insurance Company, which said company had obtained upon the foreclosure of the aforesaid eight hundred dollar mortgage as hereinafter set out; said Thompson did not agree to pay any of said incumbrances. Kupfer at once entered into the possession of the forty-seven acres, and more than one year thereafter Thompson conveyed the same to him by deed.

"5½. The court finds that after the agreement between Kupfer and Thompson, as set out in number five herein, it was agreed that Kupfer would convey the land to Piper, and in lieu of his agreement to have the incumbrances paid when he sold the land, it was agreed that Piper should assume the payment of the incumbrances and the deed executed by Kupfer to Piper was executed in pursuance of the said agreement. The only evidence

of such changing of the agreement between said Thompson and Kupfer being the deed from Kupfer to Piper.

"6. And the court further finds that the said Ætna Life Insurance Company's mortgage so executed by said Kupfer for eight hundred dollars became due by reason of the nonpayment thereof, with interest thereon, and suit was filed in the Pulaski Circuit Court against John Kupfer, Maria Kupfer, his wife, Fritz Kupfer, Christian Blockberger and others, to foreclose said mortgage; that a judgment and decree was entered in said action foreclosing said mortgage against each of said defendants, including said Christian Blockberger, and the court in said foreclosure proceedings found and decreed that all defendants, including said Christian Blockberger, had been duly notified of the filing and pendency of said action, and the said mortgage to said Ætna Life Insurance Company was duly foreclosed in said action against all of said defendants, and said land in section two, containing one hundred and sixty acres, ordered sold to pay the same, and said Ætna claim was held to be the first and best lien on said land; that on the 31st day of May, 1879, said land in section two was sold under said foreclosure proceedings to said Ætna Life Insurance Company for five hundred dollars, which left a personal debt over unpaid of about five hundred dollars; that a sheriff's certificate of sale was issued to said Ætna Life Insurance Company, reciting such sale, and conditioned for a deed if said land was not redeemed within the time allowed by law.

"7. And the court finds that on the 26th day of August, 1879, the defendant, William H. Thompson, in pursuance to his agreement with John Kupfer, as set out in finding number five herein, sold the whole two hundred and forty acres of land before described to Andrew J. Piper and Jesse Piper for two thousand seven hundred

dollars, which sum said Pipers agreed to pay in the following manner, to wit:

"*a.* They agreed to pay to the Ætna Life Insurance Company the full amount then due said company, being one thousand eighty one dollars and forty-two cents, principal and interest, and costs necessary to redeem from aforesaid sheriff's sale, and the balance of the judgment yet held by said company against Kupfers.

"*b.* They agreed to pay the principal and interest of the Blockberger mortgage.

"*c.* They agreed to pay all taxes and to pay certain other judgments and costs, amounting to ninety-one dollars and ninety cents.

"*d.* They agreed to pay to Thompson four hundred and eighty-nine dollars, and

"*e.* To convey to said Thompson eighty acres of land in Nottaway county, Missouri, valued at seven hundred dollars.

"And, thereupon, at the request of the said Thompson and to carry out his agreement, as before set out, John Kupfer, by a warranty deed, in which his wife joined, conveyed said land to Andrew J. Piper and Jesse Piper, in which deed the following recital was inserted:

" 'This conveyance is made subject to a judgment in favor of the Ætna Life Insurance Company, of Hartford, Conn., amounting to one thousand, eighty-one dollars and forty-two cents, principal, interest, and costs, and also subject to taxes and two judgments and costs, amounting to ninety-one dollars and ninety cents, and also subject to a mortgage in favor of Christian Blockberger for two hundred and seventy-three dollars and seventy-two cents, and the interest thereon; all of which the grantees herein agree to pay as a part of the purchase-money for the above described real estate.' And said Pipers accepted said deed and caused the same to be properly re-

corded in Pulaski county, Indiana, on the first day of September, 1879, and they took possession of the land therein described under said deed in the month of October, 1879; that prior to the execution of said deed the said John Kupfer never knew said Pipers or either of them, and never had any contract with them or either of them, and neither of said Pipers were present when said deed was signed; that the only contract which said Kupfer had with reference to the sale of the land to Piper, except the execution of a deed, was had with the said William Thompson. And the aforesaid recital in said deed was inserted therein at the instance of said Thompson; that the said deed from Kupfer to the said Pipers was by Kupfer delivered to said Thompson, and by Thompson delivered to Pipers; that Kupfer never received any part of the consideration which Piper paid for said land, but whatever part of the consideration for the said land which said Pipers paid was paid according to the recital of the said deed.

"8. And the court further finds that the land in section two was not redeemed from the sheriff's sale referred to in the finding, number six herein, within one year from the date of such sale, and that on or about the 20th day of September, 1880, Andrew J. Piper and Jesse Piper paid to the clerk of the Pulaski Circuit Court of Indiana, for the Ætna Life Insurance Company, three hundred and thirty-three dollars and thirty-three cents cash, and executed to said company a mortgage upon the said land in section two for eight hundred dollars, the same being accepted by the said Ætna Company in full satisfaction of the amount due the said company upon the judgment referred to in finding number six herein, and to redeem from the aforesaid sheriff's sale, and thereupon the said Ætna Company delivered to said Piper and Piper the certificate of purchase before issued to said company

with a written assignment thereof thereto attached, and dated June 4, 1880, assigning said certificate to said Piper, who, on the same day, asked and received from the sheriff of Pulaski county, Indiana, a sheriff's deed in due form upon the said certificate for the said southwest quarter of section two, which deed was duly recorded on the next day in Pulaski county, Indiana; that the said assignment of the sheriff's certificate of sale was procured by said Piper and made by the said Ætna Life Insurance Company upon the advice of Mr. Nye, the attorney for said Piper, and said company, and the advice of Mr. Agnew, the clerk of Pulaski Circuit Court, and for the purpose, among other things, of cutting out and defeating the lien of the Blockberger mortgage, and said mortgage was properly recorded in Pulaski county, Indiana, September 21, 1880.

"9. And the court finds that on the 20th day of September, 1880, the said Jesse Piper, by deed in due form, conveyed his interest in the land in section two, aforesaid, to Andrew J. Piper.

"10. And the court finds that on November 21, 1885, Andrew J. Piper and wife, by a warranty deed, conveyed the said one hundred and sixty acres in section 2 to defendant herein, Henry M. Sourbeer, and the said Sourbeer, as a part of the price to be paid for said land, agreed to pay the Ætna Life Insurance Company mortgage of eight hundred dollars, and, at the time of the execution of said deed and the acceptance of said deed by said Sourbeer, he had no actual knowledge of the existence of the Blockberger mortgage.

"11. On the 9th day of February, 1886, the said Sourbeer, by a warranty deed, in which his wife joined, conveyed the west half of said southwest quarter of section 2 to the defendant Andrew J. Gellinger, and, as a part of the purchase-price of the same, the said Gellinger

agreed to pay one-half of the aforesaid mortgage to the Ætna Life Insurance Company, and, at the time the said deed was so made and accepted, neither said Gellinger nor Sourbeer had any actual knowledge of the existence of the said Blockberger mortgage.

"12. Prior to the 11th day of May, 1889, the defendant Henry M. Sourbeer made an application in writing, through Mr. Barnett, of Winamac, Ind., to Winfield Miller, of Indianapolis, Ind., for a loan of five hundred and fifty dollars, and to secure the payment of the same offered a mortgage upon the east half of the southwest quarter of section 2, in township 31 north, range 2 west, in Pulaski county, Indiana, and, at the same time, the defendant Andrew J. Gellinger made a like application for the loan of a like amount, and offered as security for the same a mortgage upon the west half of the southwest quarter of said section 2. Upon the presentation of said applications to the said Miller, he came to Pulaski county and examined said lands for the purpose of ascertaining the value thereof, and after being satisfied with the security offered, the said Miller agreed to make the loan as asked for upon the showing of a sufficient title, and thereupon the said Sourbeer and Gellinger caused abstracts of title to be prepared for each of said tracts of land and forwarded to the said Miller at Indianapolis, and upon the receipt of said abstracts of title by said Miller, he submitted them to his attorney, Charles E. Barrett, for examination, and the said Barrett, after examining the said abstracts of title, and causing certain corrections to be made therein, believing in good faith that they showed a perfect title to the said lands to be in said Sourbeer and Gellinger, and believing in good faith that the only lien existing against said lands was the mortgage of the Ætna Life Insurance Company, executed

on the 20th day of September, 1880, by Piper and Piper, gave to the said Miller and to the said plaintiff his opinion, as an attorney, that the said Sourbeer and Gellinger held said lands in fee simple by a perfect title, and that the only lien thereon was the said eight hundred dollars to the said Ætna Life Insurance Company, and thereupon the said Miller, believing and relying upon the opinion of said Barrett, and believing that said Sourbeer and Gellinger were the owners of said lands by perfect titles, and that there were no liens thereon except the said eight hundred dollar mortgage, prepared two notes for five hundred and fifty dollars each, and to each of said principal notes he attached ten coupon interest notes for nineteen dollars and twenty-five cents each, all bearing date May 11, 1889, and bearing interest at the rate of eight per cent. per annum after date, and providing for the payment of attorney's fees, and at the same time said Miller prepared a mortgage upon the east half of said one hundred and sixty acres, securing one of said principal interest notes and the ten coupon interest notes thereto attached, and another mortgage upon the west half of said land, securing the other of said principal note and the ten coupon interest notes thereto attached, all said notes and mortgages being payable to the plaintiff herein, and at the same time said Miller drew two drafts upon the plaintiff herein, the Connecticut Mutual Life Insurance Company, for five hundred and fifty dollars each, one being made payable to the defendant Gellinger, and immediately sent said notes, mortgages and drafts to Mr. Barnett, at Winamac, Indiana. Upon the receipt of said papers at Winamac, the said Henry M. Sourbeer executed one of said principal notes, and the ten coupon interest notes thereto attached, and indorsed the draft payable to him, and he and his wife executed the said mortgage securing the

said notes, and the defendant Gellinger executed one of said principal notes and the ten coupon notes thereto attached, and indorsed the draft payable to him, and he and his wife executed a mortgage securing the same, and thereupon the said Barnett caused the said mortgages to be properly recorded, and, together with the said notes, to be returned to the said Winfield Miller, and he cashed said drafts, and, out of the money received therefrom, paid to the agent of the Ætna Life Insurance Company, nine hundred and forty-five dollars and fifty-five cents, which sum was accepted by said company in full satisfaction of the amount then due upon the mortgage executed September 20, 1880, by said Piper and Piper, and on the 1st day of June, 1889, said Ætna Company executed a proper release of the mortgage, and caused the same to be properly recorded June 5, 1889, and the court finds that throughout the whole of the transaction, before set out in this finding, the said Mr. Barnett was the agent of the defendants Sourbeer and Gellinger, and all of his acts herein were done as the agent of said defendants, and he was at no time the agent of the plaintiff or of Winfield Miller, and that said Winfield Miller was the agent of the plaintiff; that said Barrett was the attorney for said plaintiff and for said Miller; that the plaintiff had no actual knowledge of the condition of the title to the lands or of the existence of the Blockberger mortgage, but acted upon the representations of its agent and attorney, and believed, at the time it was making said loan, that it was acquiring the first lien upon the lands described in the said mortgages; that by default in the payment of the interest, both of said mortgages are now due, and there is due from the said Sourbeer to the plaintiff, the sum of six hundred and sixty dollars and four cents, and from the said Gellinger the sum of six hundred and sixty dollars and four cents, which

sums are liens upon the lands described in the respective mortgages, and are collectible without relief from valuation or appraisement laws.

"13. And the court further finds that this action was commenced by the plaintiff on the 5th day of September, 1891, and that notice of the pendency thereof was served upon the defendant, Christian Blockberger; that after the service of said process, and before the said Blockberger had appeared to the said suit, he sold his aforesaid note and mortgage to the defendants and cross-complainants, William H. Thompson, Burlingame Borders, and Frank L. Dukes, for sixty dollars, which sum was paid, one-half by said Thompson, and one-half by said Borders and Dukes, and, by agreement between the said parties, the said note and mortgage was by said Blockberger assigned in writing to the said Thompson, who agreed to take and hold said note and mortgage for the benefit of himself and said Borders and Dukes, he owning one-half, and Borders and Dukes the other half; that said assignment was properly recorded in Pulaski county, Indiana, April 27, 1892, and the same was executed by the said Blockberger and properly acknowledged on the 5th day of November, 1891; that there is due and unpaid upon said mortgage the sum of five hundred and twenty dollars, and the same is a lien upon the said southwest quarter of said section two, in township thirty-one north, range two west, in Pulaski county, Indiana, and collectible without relief from valuation or appraisement laws.

"(Signed)        JOHN H. GILLETT, *Judge.*

"And now, after the court had announced and filed its finding herein as above, the plaintiff moves the court for a supplemental finding herein as to the rate of interest the amount paid the Ætna Life Insurance Company

should bear, and the court sustains said motion, and now makes the following supplemental finding, to wit:

"And the court further finds that the mortgage to the Ætna Life Insurance Company, paid by and with the money of the plaintiff, as hereinbefore and hereinabove found by the court, was, at the time of its payment, bearing seven per cent. interest, but that the plaintiff is entitled to recover only the legal rate of interest, to wit, six per cent., from the date of payment to this date.

"And the defendants, Thompson, Borders and Dukes, object to such supplemental finding, and which objection is by the court overruled, and to which ruling of the court the defendants aforesaid objected and excepted, and thereupon the court announced its conclusions of law herein in these words:

"1. And as a conclusion of law the court finds that the plaintiff is entitled to be subrogated to the lien of the Ætna mortgage, which amounted at the date of payment thereof, May 11, 1889, to nine hundred and forty-five dollars and fifty-five cents, with six per cent. interest thereon from said date and now amounting to one thousand one hundred and thirty-six dollars, and that said sum is the first and best lien on said southwest quarter of section two, township thirty-one north, range two west, in Pulaski county, Indiana.

"And as a further conclusion of law the court finds that William H. Thompson, Burlingame Borders and Frank L. Dukes have the second lien on said described land for the sum of five hundred and twenty dollars; and as a further conclusion of law the court finds that the plaintiff has a third lien on the east half of said land for ninety-four dollars and four cents; and as a further conclusion of law the court finds that the plaintiff has a third lien on the west half of said lands for ninety-four

dollars and four cents, and that all said sums are payable without relief from valuation or appraisement laws.

"And as a further conclusion of law the court finds that said mortgaged lands should be sold, and that the plaintiff, the Connecticut Mutual Life Insurance Company, should be first paid out of the proceeds of such sale the sum of one thousand one hundred and thirty-six dollars, with six per cent. interest from this date.

"2. That the plaintiff's costs and costs of sale should next be paid.

"3. That the defendants, Thompson, Borders and Dukes should then be paid the sum of five hundred and twenty dollars, with six per cent. interest from this date.

"4. That the costs of Thompson, Borders and Dukes should then be paid.

"5. That the plaintiff, from the proceeds derived from the sale of the west half of said land, be paid ninety-four dollars and four cents, and out of the east half of said lands ninety-four dollars and four cents, with six per cent. interest on said sums from this date.

"And the court further finds that the plaintiff is entitled to recover from the defendants, Thompson, Borders and Dukes, its costs herein upon the issues joined between the plaintiff and said defendants, and is entitled to recover from the defendants, Sourbeer and Gellinger, its costs herein.

"And the court further finds, as a conclusion of law herein, that Christian Blockberger has no interest in the subject-matter herein, he having assigned all his interest to said Thompson, Borders and Dukes.

"(Signed)        JOHN H. GILLETT, *Judge.*"

It is first contended by appellants that the facts found do not show a right in the Connecticut Mutual Life Insurance Company to be subrogated to the rights of the Ætna Insurance Company's mortgages.

It appears, from the second and third findings of the court, that the first Ætna mortgage, given by the Kupfers, then owners of the land in controversy, on the 14th day of August, 1877, was a superior lien to the Blockberger mortgage, given by the same owners on September 4, 1877.

By the sixth finding, it appears that the Ætna company foreclosed its first mortgage against the owners of the land and others, including Christian Blockberger, holder of the junior mortgage, and that, on the 31st of May, 1879, the land was sold at sheriff's sale and a certificate given to the Ætna company.

From finding seven, it appears that on August 26, 1879, the Kupfers sold the land to the Pipers, subject to the Ætna and also to the Blockberger mortgage, both of which, together with other liens, Pipers agreed to pay, as part of the purchase-price of the land. This assumption of payment was recited in the deed of conveyance from Kupfers to Pipers.

From the eighth finding, we learn that on or about September 20, 1880, the Pipers paid to the clerk of the Pulaski Circuit Court, for the Ætna company, three hundred and thirty-three dollars and thirty-three cents, and also executed to the company a mortgage on the land for eight hundred dollars, "the same being accepted by the said Ætna company in full satisfaction of the amount found due the said company upon the judgment referred to in finding number six herein, and to redeem from the aforesaid sheriff's sale."

This finding shows further that the company then assigned its sheriff's certificate to the Pipers, upon which they took out a sheriff's deed for the land. The purpose in receiving the sheriff's certificate and deed was to cut off the lien of the Blockberger mortgage.

Appellants, who have succeeded to the ownership of

the Blockberger mortgage contend that these findings show that the first Ætna mortgage was released and fully discharged by the payment made and the new mortgage given by the Pipers, and that consequently the Blockberger mortgage had priority of lien over the second Ætna mortgage.

Appellee, the Connecticut company, contends, on the other hand, that the second Ætna mortgage debt was a renewal of a part of the first, and that the lien of the first mortgage was not lost, but was retained, together with the priority thereof, in the second mortgage.

The principle on which a prior lien is preserved for the security of a creditor who renews his credit as an accommodation to the debtor, is not different from the principle of subrogation.

The question here is, whether the first Ætna mortgage debt was paid and canceled, or whether it was renewed and the lien preserved in the second mortgage.

It is true, as was said in *Shinn* v. *Budd*, 14 N. J. Eq. 234, that "Subrogation, as a matter of right, as it exists in the civil law, from which the term has been borrowed and adopted in our own, is never applied in aid of a mere volunteer."

To the same effect, see *Gadsden* v. *Brown*, 1 Speer's Eq. (S. C.) 37; Sheldon Subrogation, sections 1, 2, 3, 5, 240; *Webster's Appeal*, 86 Pa. St. 409; *Hoover* v. *Epler*, 52 Pa. St. 522; Pomeroy's Eq. Juris., sections 1212 and 1213, and notes; *Suppiger* v. *Garrels*, 20 Ill. App. 625.

In *Ætna Life Ins. Co.* v. *Middleport*, 124 U. S. 534, it is said that the person seeking subrogation must have paid the debt of another under some necessity to save himself from loss which might arise or accrue to him by the enforcement of the debt in the hands of the original creditor.

The decisions of this State are to the same effect as to

volunteers, and hold, substantially, that it is only in case where the person paying the debt stands in the situation of a surety, or is compelled to pay in order to protect his own interests, or in virtue of legal process, that equity, as a matter of course and without special agreement, substitutes him in the place of the creditor; and that, in the absence of an agreement to that effect, a stranger paying the debt of another, will not be subrogated to the creditor's rights.  Payment by such stranger absolutely extinguishes the debt.  *Richmond* v. *Marston*, 15 Ind. 134; *Spray* v. *Rodman*, 43 Ind. 225; *McClure* v. *Andrews*, 68 Ind. 97; *Binford, Admr.*, v. *Adams, Admr.*, 104 Ind. 41.

From a consideration of the foregoing authorities it might seem that when the Ætna company received part payment in cash of its first mortgage debt, and took a mortgage to secure the balance, that alone, without any special agreement operated as an extinguishment of the first debt, and of the mortgage lien securing it.  This would doubtless be the case if there were no intervening equity, on account of which the lien of the first mortgage ought to be kept alive.

We think there was such an equity.  When the Ætna company foreclosed its first mortgage, it made Christian Blockberger a party, and had judgment of foreclosure against him.  His mortgage was, on its face, made junior to the Ætna mortgage.  When, therefore, the company took from the owners of the land part payment, and a new mortgage for the original mortgage debt, and when besides it attempted to give to the owners cumulative title by assigning to them, and so keeping alive its sheriff's certificate, it seems clear that the company was of opinion that the Blockberger mortgage was cut out by its foreclosure proceedings, and that, consequently, its new mortgage would be a first lien.  Other-

wise it is plain that the company would not have surrendered its sheriff's certificate and accepted a junior mortgage in place of the senior mortgage which it had already foreclosed. Equity; therefore, will interpose in the interests of simple right and justice to preserve to the company its first lien upon the land.

The Ætna company was evidently in ignorance of the fact that the Pipers, as owners of the land, had assumed payment of the Blockberger mortgage, and that on payment and release of the first Ætna mortgage the Blockberger mortgage would become a first lien, and prior to the lien of the second Ætna mortgage.

In *Sidener* v. *Pavey*, 77 Ind. 241, it was said that, "when a new mortgage is substituted in ignorance of an intervening lien, the mortgage released through mistake may be restored in equity, and given its original priority as a lien, where the rights of innocent third parties will not be affected." Citing Jones Mort., section 971, and *Bruse* v. *Nelson*, 35 Iowa, 157.

There were no innocent third parties in this case whose rights would be affected. Blockberger and those who have since succeeded to his rights are all shown to have been aware of the foreclosure and other proceedings in relation to the mortgages.

The same authority, *Sidener* v̇. *Pavey*, *supra*, citing numerous authorities, says that a court of equity will keep an incumbrance alive, or consider it extinguished, as will best subserve the purposes of justice, and the actual and just intention of the party. It is further said in that case, citing authorities, that in cases of fraud or mistake, a third person who pays the mortgage at the request of the debtor, and takes a new mortgage for the same debt, will be subrogated to the rights of the original mortgagee, as against intervening incumbrances existing at the time of the cancellation of the first mortgage.

Thompson *et al. v.* The Connecticut Mutual Life Insurance Co. *et al.*

The lien of the first Ætna mortgage was therefore not extinguished by the giving of the second Ætna mortgage for the same debt, but was kept alive to protect its holder from the intervening lien of the Blockberger mortgage.

What we have said as to the lien of the Ætna mortgages applies also to the lien of the Connecticut Insurance Company's mortgage, as appears from other findings. From the tenth and eleventh findings it appears that the appellees Gellinger and Sourbeer, who, as owners of the land, applied for and received the loan secured by the Connecticut company's mortgage, had no knowledge of the Blockberger mortgage.

By the twelfth finding we learn that the same ignorance existed on the part of the Connecticut company when they took their mortgage and made their loan. The advice of the company's attorney, deceived no doubt as a result of the original Ætna foreclosure proceedings, seems to have been relied upon, and with reason, by the company. The company, as we think appears clearly from the findings, honestly believed, and had good reason to believe, although actually mistaken, that the second Ætna mortgage was the only lien upon the land.

In *Green* v. *Milbank*, 3 Abbott's New Cases, 138, the court held that when parties advanced money to take up a mortgage "upon the understanding and belief that there was no lien upon the premises but that mortgage," it is but just and equitable that such parties should be subrogated to the rights of the mortgage so taken up.

In *Barnes* v. *Mott*, 64 N. Y. 397, there was a like holding.

*Johnson* v. *Barrett*, 117 Ind. 551, was a case where a husband and wife executed a mortgage upon the husband's land. The land was subsequently conveyed to the wife, who died shortly after a judgment of foreclos-

ure was rendered on the mortgage, leaving her husband and children surviving. It was held that one who, at the husband's solicitation and on his representation that the title was in him, and without knowledge to the contrary, paid the amount of the mortgage judgment, and caused satisfaction to be entered, taking the husband's note and mortgage for the amount so advanced, was entitled to subrogation to the rights of the first mortgage.

In the same case it was held that where a mortgage is executed to raise money to discharge a prior incumbrance, and the money is so applied, the mortgagee becomes entitled to be subrogated to the rights of the prior incumbrancer when such subrogation is made necessary for the better security of his mortgage debt. Citing *Gilbert* v. *Gilbert*, 39 Iowa, 657.

For further authorities to the effect that, under the equitable principle of subrogation, one who pays a mortgage debt under an agreement for an assignment of the old mortgage, or for a new mortgage for his own benefit or protection, acquires a right to the security held by the first mortgagee. See Dixon Subrogation, section 165; Harris Subrogation, sections 811, 816; *Tradesmen's Building, etc., Ass'n* v. *Thompson*, 32 N. J. Eq. 133; *Emigrant Industrial Savings Bank* v. *Clute*, 33 Hun, 82; *Emmert* v. *Thompson*, 49 Minn. 386; *Homeopathic, etc., Ins. Co.* v. *Marshall*, 32 N. J. Eq. 103; *Gans* v. *Thieme*, 93 N. Y. 225; *Moore* v. *Lindsey*, 52 Mo. App. 474; *Norton* v. *Highleyman*, 88 Mo. 621; *Hough* v. *Ætna Life Ins. Co.*, 57 Ill. 318; *Detroit Fire Ins. Co.* v. *Aspinall*, 48 Mich. 238; *Walters* v. *Walters*, 73 Ind. 425; *Pouder* v. *Ritzinger*, 102 Ind. 571, and *Pouder* v. *Ritzinger*, 119 Ind. 597.

We conclude that the lien of the Ætna company's first mortgage was not extinguished, but was kept alive in the second Ætna mortgage, as against the lien of the Blockberger mortgage; and, also, that the appellee, the

Connecticut Insurance Company, in loaning its money for the payment of the second Ætna mortgage, was subrogated to the rights of the holder of that mortgage, to the extent of the debt due and paid to the Ætna Insurance Company out of the money so loaned, being, as found by the court in in its twelfth finding, "nine hundred and forty-five dollars and fifty-five cents, which sum was accepted by said company in full satisfaction of the amount then due upon the mortgage executed September 20, 1880," and that the amount so paid, with interest, is, consequently, a first lien on the land in question in favor of said appellee.

It appears that "after the court had announced and filed its finding herein," the appellee insurance company moved the court for a supplemental finding as to the rate of interest which the amount paid the Ætna Insurance Company should bear, and that the court sustained said motion and made an additional finding of facts, over the objection and exception of appellants.

Counsel for the appellee company have offered no explanation or defense of this action of the court, not even referring to it in their otherwise well considered brief.

It must be admitted that there is serious conflict in the decisions of this court upon the question.

It is provided, in section 560, R. S. 1894 (section 551, R. S. 1881), that "Upon trials of questions of fact by the court, it shall not be necessary for the court to state its finding, except generally for the plaintiff or defendant, unless one of the parties request it, with a view of excepting to the decision of the court upon the questions of law involved in the trial; in which case, the court shall first state the facts in writing, and then the conclusions of law upon them, and judgment shall be entered accordingly."

In the case of *Wray* v. *Hill*, 85 Ind. 546, this court,

in considering the foregoing provisions, said: "The statute evidently means that the finding of the court upon a question of fact shall stand upon substantially the same footing as the verdict of a jury, for the provisions concerning new trials apply as well to the decisions of the court upon questions of fact as to the verdicts of juries. The adjudged cases proceed upon this theory, for it is uniformly held that where a special finding is defective, the remedy is by motion for a *venire de novo,* and that where the facts are not correctly found, the method of procedure is on a motion for a new trial."

Following the decision in *Wray* v. *Hill, supra,* it would seem that the action of the court here complained of was error, and that the failure to find as to interest should have been reached in a motion for a new trial, and not by motion for additional or supplemental finding.

But, in a later decision, *Knox* v. *Trafalet,* 94 Ind. 346, the court, in considering the same question, said: "Under this statute, when a case is tried by the court, a special finding is similar to a special verdict when the case is tried by a jury. Upon the return of a special verdict by a jury, either party has a right to object to the same, and move the court to have the jury to make it more specific, or to move to strike out any part of it, or to require the jury to state further the facts of any issue omitted, and we see no reason why the same rights should not extend to a special finding made by the court."

If we had but these two decisions to consider, we should perhaps be able to reconcile them, and conclude that a special finding, like a special verdict, might be amended on motion, or, on failure to so amend, that the complaining party might also resort to a motion for a new trial for the same purpose.

The statutes themselves would seem to bear out such a conclusion. It is provided, in section 561, R. S. 1894 (section 552, R. S. 1881), that "The provisions of this code respecting trials by jury apply, so far as they are applicable, to trials by the court."

A jury, at any time before its discharge from the consideration of a case, may amend its verdict; and no reason suggests itself why this provision is not applicable to a trial by the court, and why, therefore, the court may not at any time during the term, and before judgment, amend its finding so as to make the same conform to the facts proved.

In *Hartlepp* v. *Whitely, etc., Co.*, 131 Ind. 543, there seems to have been an uncertainty manifested by the court concerning the proper practice as to amending the finding before entering judgment. It is there said: "The court can not amend and supply defects in a special finding, on motion of one of the parties to a suit, after the rendition of the judgment, even if it could do so before judgment."

The same uncertainty was manifested in *Barnhill* v. *Mill Spring, etc., Gravel Road Co.*, 51 Ind. 354, where a motion to make the special finding more specific and full had been overruled. Inasmuch, however, as the motion was not accompanied with a statement of the alleged defects, this court refused to pass upon the correctness of the ruling below, saying: "If, then, it is a proper practice to present the question by a motion that the court make the special finding more full and complete, we think the alleged omissions should be pointed out to the court."

In jurisdictions having statutes similar to our own for the trial of causes by the court, it seems that the current of the decisions is to the effect that amendments to the special findings may be made at any time before judgment,

and in some cases even after judgment, on motion or exceptions filed.

The Dakota statute, sections 266, 267, code (sections 5066, 5067, R. S. 1887), provides for written findings and conclusions, as does ours, the only material difference being that by our statute the judge may take his finding under advisement for not more than sixty days after submission, whereas by the Dakota, as also by the California statute, the time given is only thirty days.

The Supreme Court of the United States, in considering a case under the Dakota statute, *North* v. *Peters*, 138 U. S. 271, said:

"The appellant, in support of his motion for a new trial, claimed that the court had omitted to find upon certain material issues in the case. The court refused to grant the motion, and made additional findings, more explicitly responsive to the questions presented by the pleadings. We are of opinion that the court, if, in the consideration of such a motion, it considers that material findings have been omitted or imperfectly stated, has authority to make such additional findings as will cure the omission, so that its record will be amended, and made to conform to the truth."

The opposite view, the court continued, is "contrary to adjudged cases, on like questions, in the highest courts of those States whose statutory provisions respecting the trial by the court of questions of fact correspond in almost every particular with sections 266, 267, of the Dakota code, *supra*."

These authorities hold that the omission to file findings of fact, judgment having been entered, is an irregularity which the court has authority to cure by supplying additional amendments until an appeal is taken, or a bill of exceptions is settled and signed by the judge. *Williams* v. *Ely*, 13 Wis. 1; *Pratalongo* v. *Larco*, 47 Cal.

378; *Ogburn* v. *Conner,* 46 Cal. 346; *Bosquett* v. *Crane,* 51 Cal. 505; *Hayes* v. *Wetherbee,* 60 Cal. 396; *Swanstrom* v. *Marvin,* 38 Minn. 359; *Vermule* v. *Shaw,* 4 Cal. 214.''

The Minnesota and Wisconsin cases cited hold that such amendments to the findings may be made, *nunc pro tunc,* after judgment.

In California it is held that the court can not reëxamine the evidence on the motion of one of the parties after it has once filed its findings and rendered judgment, and on such reëxamination substitute different findings of fact and reverse its former decision. *Prince* v. *Lynch,* 38 Cal. 528.

It is, however, held to be the duty of the court to supply an omission when its attention is called to the subject by proper exception to the findings. *Logan* v. *Hale,* 42 Cal. 645.

It has also been there decided that findings by the court can not be amended after the entry of judgment, and the overruling of a motion for a new trial. *Bate* v. *Miller,* 63 Cal. 233.

But the question has never been more directly decided in favor of such amendment of special findings on motion or exception than by this court, in the case of *Gulick* v. *Connely,* 42 Ind. 134, a case which seems to have been quite overlooked in our recent decisions.

In that case, pending a motion for a *venire de novo,* the court made an amendment to its special findings, and, in considering the correctness of the ruling upon the motion for a *venire de novo,* this court said:

''It is very earnestly insisted by counsel for appellant, that in deciding upon this question, we can only look to the original special findings of the court, for the reason that the court, having made and filed his findings, possessed no power to make any addition thereto. We think

the objection is untenable. We are unable to see any valid objection to the action of the court. The special finding of the court stands upon different grounds than the verdict of a jury, but even a jury, before its discharge, may be required to correct and perfect the verdict or answers to interrogatories. The same judge, ordinarily, presides during the entire term, and if he should, in the hurry of business, omit to find upon one of the issues, no injury can result, in permitting him, during the term, to correct his finding.''

No good reason, so far as we have been able to discover, has been advanced to show why the court should not correct its own special finding, any more than any other record made by the court.

Our procedure under the present constitution seems to have been molded with special reference to the avoiding of the rigid rules of the common law wherever they interfered with what should be the object and end of all litigation, namely, the speedy and just decision of causes. Whatever, therefore, tends to a fair and just decision, with the least possible expense, annoyance and delay to litigants, must be in harmony with the spirit of our code.

In section 670, R. S. 1894 (section 658, R. S. 1881), it is provided, amongst other things, that ''no judgment shall be stayed or reversed, in whole or in part, by the Supreme Court, for any defect in form, variance, or imperfections contained in the record, pleadings, process, entries, returns, or other proceedings therein, which by law might be amended by the court below.''

In section 401, R. S. 1894 (section 398, R. S. 1881), it is provided that ''the court must, in every stage of the action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party.''

In section 399, R. S. 1894 (section 396, R. S. 1881), it is provided that the court may "supply an omission in any proceedings, on complaint or motion filed within two years."

Indeed, this last section alone seems broad enough to directly authorize the amendment which we are considering. The words are: "Supply an omission in any procedings, on * * * motion filed." The finding of the facts in the case was, without doubt, a "proceeding" in the court. There was an inadvertent "omission" by the court to find as to the interest upon the amount due; and the appellee made its "motion"-to "supply" the "omission."

It is true that an error in a special finding may be reached by a motion for a new trial; but if the court may itself, on motion, make correction of the mistake, it would seem that the exercise of such power would be in the interests of justice and fair dealing. Litigants ought to be saved the needless delay and expense of a retrial, if justice may be attained as well without it.

The twelfth section of our bill of rights requires that "Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

Certainly this requirement would be promoted by allowing a trial judge to correct a mistake made in his findings, where, as in the present case, there could be no question that the correction ought to be made.

In *Parker* v. *State, ex rel.*, 133 Ind. 178 (216), the power of this court to correct its own mistakes was strongly asserted, and the authorities cited. No reason is apparent why like power is not inherent in trial courts.

The right of the court to amend an inadvertence in its own finding, so as to make the facts found conform to the truth, is quite a different thing from the right of a

party to have a finding corrected so as to make it conform to his own views as to the weight of the evidence. If the court is of opinion that the facts found are in accordance with the evidence, and that no oversight or mistake has been made, then the party has no right to set up his own judgment against that of the court, and ask that the finding be modified or the decision changed. That would be to substitute the views of a party litigant for those of the court trying the case.

In such case, if the party believe the court to be in error, he can proceed only by motion for a new trial, with a view to appeal to a higher tribunal, as shown in, *Radabaugh* v. *Silvers, Admr.*, 135 Ind. 605 (610), and cases there cited. In that way only can the matured decision of the court be changed. *Prince* v. *Lynch, supra.*

The correction of an inadvertent mistake, however, either on motion of a party or by the court on its own motion, so as, in the opinion of the court, to make the finding conform to the facts proved, is quite another thing.

We are, therefore, of opinion that the trial judge should, in all cases, be permitted to amend his special findings and conclusions of law, at any time before final judgment and during the period within which a bill of exceptions containing the evidence may be filed; and, consequently, that the case of *Wray* v. *Hill, supra*, and all our decisions following that case must be modified accordingly.

The court, therefore, did not err in making its supplemental finding of facts in this case.

It is also contended in this case that the court erred in its conclusions of law that appellee's debt should be collected without relief from appraisement; that there was no finding on that point. In this, counsel are in error. In its twelfth finding the court found that appellee's

The Pittsburgh, Cincinnati, Chicago and St. Louis Ry. Co. v. Burton.

mortgage debt was collectible without relief from valuation or appraisement laws.

Counsel for appellee contend that the conclusions of law should be restated so as to hold that the Blockberger mortgage is not a second lien on the land in question. The action of the court, however, was correct in this particular. The Pipers, in their deed of purchase, assumed the payment of this debt as well as that due the Ætna company. The Pipers were owners of the land by virtue of that deed. The deed from the sheriff, at most, improved their title only by cutting off all liens not assumed by them in their deed from the Kupfers.

We find no available error in the record.

The judgment is affirmed.

Filed Nov. 13, 1894.